SUGIYAMA CHAIN CO., LTD., I & OC of Japan Co., Ltd. and HKK Chain Corp. of America, Plaintiffs,

v.

UNITED STATES, Defendant.

Court No. 90–11–00605.

United States Court of International Trade.

June 30, 1992.

**991**

Tanaka Ritger & Middleton (Patrick F. O'Leary), Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Velta A. Melnbrencis), Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce (D. Michael Kaye, Washington, D.C., Attorney–Advisor, of counsel), for defendant.

## MEMORANDUM OPINION

CARMAN, Judge:

Plaintiffs move for judgment on the agency record pursuant to Rule 56.1 of the Rules of this Court. Defendant opposes the motion, but concedes that its finding of single corporate dumping margins for Plaintiffs' roller chain, rather than channel-specific dumping margins, and the imposition of new cash deposit rates, were not investigated, not supported by substantial evidence on the record, and not in accordance with law. Defendant requests a remand of this case to the United States Department of Commerce (Commerce) for the preparation of revised final results to show channel-specific dumping margins for those distributions that were investigated and to correct the cash deposit instructions issued to the Customs Service.

Plaintiffs challenge the final results of two administrative reviews respectively made by the United States International Trade Administration (ITA) of the Department of Commerce pertaining to roller chain, other than bicycle from Japan, for the following two years: April 1, 1987 through March 31, 1988 (1987–88 review period) set forth in *Final Results of Antidumping Duty Administrative Review: Roller Chain, Other Than Bicycle, from Japan,* 55 Fed.Reg. 42,602 (Oct. 22, 1990) and April 1, 1988 through March 31, 1989 (1988–89 review period) set forth in *Final Results of Antidumping Duty Adminis-*

*trative Review: Roller Chain, Other Than Bicycle, from Japan,* 55 Fed.Reg. 42,608 (Oct. 22, 1990).

Plaintiffs contend there are five issues of law that should be addressed by this Court, which are as follows:

### Single Corporate Dumping Margin

1. Whether the reporting by the ITA of a single corporate dumping margin combining the separate dumping margins computed for Plaintiff Sugiyama's (SY's) sales to Plaintiff I & OC of Japan Co. (I & OC) and SY's sales through HKK Chain Corporation of America (HKK) was in accordance with law. Defendant concedes this issue and it is remanded to Commerce.

### Application of Cash Deposit Rates

2. Whether the directions by the ITA to the Customs Service, following the publication of the final results, to collect a cash deposit of estimated antidumping duties for shipments through Plaintiff SY's uninvestigated distribution channels were in accordance with law. Defendant concedes this issue and it is remanded to Commerce. Commerce is directed on remand to determine what deposits, if any, were collected on account of Plaintiffs' distribution channels that were not investigated.

### Credit Expense Input Error Question

3. Whether the foreign market value (FMV) calculations of the ITA were supported by substantial evidence on the record and otherwise in accordance with law where the home market credit expenses contained a computer error made by Plaintiff SY and reported to Commerce in Plaintiffs' July 27, 1990 prehearing brief.

### Computer Programming Error Issue

4. Whether the ITA's foreign market value determinations were supported by substantial evidence on the record and otherwise in accordance with law where the ITA made a programming error in selecting FMVs to be compared with certain purchase price sales.

*Exchange Rate Lag Rule Issue*

5. Whether the refusal by the ITA to apply the exchange rate lag rule found in Commerce Department Regulations 19 C.F.R. § 353.60(b) (1990) for the period October 28, 1987 through March 31, 1988 was supported by substantial evidence on the record and otherwise in accordance with law.

*BACKGROUND*

On September 21, 1989, Commerce transmitted questionnaires covering the respective review periods to the United States Embassy in Tokyo for delivery to Plaintiffs. Administrative Record Document (AR Doc.), Reel (R) 1, Frame (F) 137. Specific instructions for calculating home market credit expense and product control designation were included with the questionnaires. AR Doc. R1 F174, F216.

Plaintiff SY submitted on December 29, 1989, its initial questionnaire response which included in narrative form a specific methodology used by SY in calculating home market credit expenses and computer tapes of home market and United States sales. AR Doc. R1 F265–66; AR Doc. Confidential (Conf.) R2, F83A, F93A.

Plaintiff SY, after having advised Commerce that SY was experiencing problems with the preparation of its computer tapes, requested an extension of time to file the tapes which were ultimately filed with Commerce in a corrected and/or revised form on January 5, 1990. AR Doc. R1 F310, F313.

Commerce issued on March 2, 1990, a deficiency letter to Plaintiff SY, requesting supplemental information, clarification of the methodology used to derive home market credit expense, and information pertaining to product comparisons (product concordance). AR Doc. R1 F319, F328, F332.

Plaintiff SY requested on April 2, 1990, the deadline for submission of responses to the deficiency letter, additional time to compile revisions of its computer tapes. This extension was granted by Commerce. AR Doc. R1 F366, F370. On April 9, 1990, Plaintiff SY filed its response to the deficiency letter, in which SY proposed new formulas for calculating home market credit expense (AR Doc.Conf. R2 F354A–55A, F389A–90A) and submitted new computer tapes that were used by Commerce in calculating dumping margins. AR Doc.Conf. R2 F193A. The response of April 9, 1990, failed to discuss Commerce's request for product concordance data.

Notices of the respective preliminary results of both reviews were published on June 27, 1990. 55 Fed.Reg. 26,243 (1990) (1987–88 review period); 55 Fed.Reg. 26,-240 (1990) (1988–89 review period). Plaintiffs filed on July 27, 1990, comments pertaining to the preliminary results. AR Doc.Conf. R2 F500A. Plaintiffs discussed the issue of utilizing only one corporate dumping rate, requested Commerce to "correct all of the CREDITH" (home market credit expense) figures on SY's tape (AR Doc.Conf. R2 F508A–510A), requested Commerce to grant a level of trade adjustment in accordance with 19 C.F.R. § 353.58 (AR Doc.Conf. R2 513A), and requested Commerce to apply the exchange rate lag rule (AR Doc.Conf. R2 F521A) in accordance with 19 C.F.R. § 353.60. Plaintiffs, however, did not comment upon any computer programming error, nor were there any comments pertaining to product comparisons. Moreover, Plaintiff SY did not submit any computer tapes reflecting what it considered to be correct home market credit expense.

Commerce published on October 22, 1990, notices of the final results of the respective administrative reviews, in which it addressed the issues raised by Plaintiffs. 55 Fed.Reg. 42,602 (1990) (1987–88 review period); 55 Fed.Reg. 42,608 (1990) (1988–89 review period).

Commerce, in regard to the question of the single dumping margin, declined in both final notices to make any adjustment. Commerce in this action, as already noted, concedes this issue. Commerce refused to correct the CREDITH figures submitted on Plaintiff SY's tapes or to employ the specific exchange rate lag rule, or to acquiesce in Plaintiffs' request for a level of trade adjustment. Commerce did not address prod-

uct comparisons in the notice, presumably because Plaintiffs never raised the question of a programming error in selecting sales for foreign market value purposes.

On November 1, 1990, Plaintiffs filed with Commerce a letter requesting Commerce to correct what the letter identified as two "ministerial errors." AR Doc.Conf. R2 F641A. The first "error" pertained to home market credit expense, and the second "error" referred to a computer programming error in regard to choice of home market sales. The letter did not state where the error occurred in the program. The letter also discussed the denial by Commerce of the requested level of trade adjustment. AR Doc.Conf. R2 F644A.

On November 21, 1990, Plaintiffs commenced this action.

## STANDARD OF REVIEW

■ This Court's jurisdiction to review the final results of an antidumping duty administrative review is limited to determining whether the final results are supported by substantial evidence on the administrative record and are otherwise in accordance with the law. 28 U.S.C. § 1581(c) (1988); 19 U.S.C. § 1516a(b)(1)(B) (1988).

■ Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). The possibility of drawing two inconsistent conclusions from the same evidence does not prevent the agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). "Rather, the court will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." *Negev Phosphates, Ltd. v. United States,* 12 C.I.T. 1074, 1077, 699 F.Supp. 938, 942 (1988) (citing *Universal*

*Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)).

■ Furthermore, Commerce's interpretation of the statutes it administers is accorded substantial weight. *Floral Trade Council v. United States,* 8 Fed.Cir. (T) ——, ——, 888 F.2d 1366, 1368 (1989) (citing *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445–46, 57 L.Ed.2d 337 (1978) and *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986)). In determining whether to sustain the agency's construction of the antidumping statute or regulation, the Court need not find Commerce's interpretation to "be the *only* reasonable interpretation, or the one which the Court views as the most reasonable. *ICC Indus., Inc. v. United States,* 5 Fed.Cir. (T) 78, 85, 812 F.2d 694, 699 (1987) (quoting *Consumer Prods. Div., SCM Corp. v. Silver Reed America, Inc.,* 3 Fed.Cir. (T) 83, 90, 753 F.2d 1033, 1039 (1985)). Commerce's interpretation of the statute is to be sustained if it "is 'sufficiently reasonable' to be accepted by a reviewing court." *Zenith,* 437 U.S. at 450–51, 98 S.Ct. at 2445–46. This court should not reject the agency's interpretation of a statute without compelling reasons to do so. *Wilson v. Turnage,* 791 F.2d 151, 156 (Fed.Cir.), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986).

The Court now turns to the contested issues presented.

## DISCUSSION

*Credit Expense Input Error Question*

■ Plaintiffs, in a prehearing administrative brief, subsequent to the preliminary findings, reported that the computer tapes of Plaintiff SY contained erroneous credit expense figures for sales pertaining to SY's related home market distribution. Commerce declined to make the correction on two grounds: (1) the figures on the tapes were inconsistent with the formulas in the narrative questionnaire response, and (2) the requested change was untimely.

Plaintiffs assert that the first ground is "simply not true," because the changes do

not represent new data, and argue, alternatively, if the changes did represent new data, then the position of Commerce was inconsistent with previous decisions of this Court. *See, e.g., Tehnoimportexport Co. v. United States,* 15 CIT ——, 766 F.Supp. 1169 (1991); *Koyo Seiko Co. v. United States,* 14 CIT ——, 746 F.Supp. 1108 (1990), *Serampore Indus. Pvt. Ltd. v. United States,* 12 CIT 825, 696 F.Supp. 665 (1988), *aff'd on remand,* 13 CIT 117, 705 F.Supp. 602 (1989).

Defendant points out that the burden for the creation of an adequate record rests with Plaintiffs. *See Chinsung Indus. Co. v. United States,* 13 CIT 103, 106, 705 F.Supp. 598, 601 (1989). Defendant observes that the statutory scheme makes clear that the general rule is that information is to be submitted during an administrative proceeding, not subsequently. Plaintiffs were in the best position to organize their own sales expense data and prepare, check, and verify the information they supplied to Commerce; Commerce was not privy to the private business affairs of Plaintiffs. Commerce, Defendant maintains, in large part, must rely upon the factual data which is submitted to it by foreign importers and others at the administrative level. Commerce receives numerous and voluminous submissions of such data during an administrative proceeding. Not uncommonly, submissions contain various discrepancies which would be entirely impracticable for Commerce to sort out. Because Plaintiff SY submitted several different versions of its response, Commerce would have been required to make a manual comparison of thousands of data entries. Even if Commerce possessed the personnel to identify errors Plaintiffs made in their data base within the statutory deadlines, Commerce would have no basis for deciding which portion of the submission was correct or erroneous.

This Court observes that if the burden of compiling, checking, rechecking, and finding mistakes in the submission of Plaintiffs were placed upon Commerce, it would transform the administrative process into a futility.

Defendant argues that if Plaintiffs did not have the time or resources to proofread its own data before submitting it, it should have at least proofread after submission and promptly notified Commerce about what errors and corrections should have been made. Plaintiffs waited until Commerce relied upon the data and completed the preliminary results and was preparing for its final determination before claiming the errors occurred. The record indicates Plaintiffs waited three and one-half months between April 9, 1990, the filing of their new questionnaire responses and tapes (AR Doc.Conf. R2 F193A) and July 27, 1990, when it filed its prehearing comments (AR Doc.Conf. R2 F500A) to bring the errors to the attention of Commerce.

After a spot check of the formula that allegedly contained the errors, Commerce concluded that the narrative questionnaire response and the credit calculations reported on Plaintiff SY's tapes were consistent. It was not until *after* publication of the final results that Plaintiffs clarified their prior request. Thus, Plaintiffs' failure to explain the alleged errors contributed to Commerce's inability to detect them.

This Court notes Plaintiffs had substantial cooperation from Commerce in securing extensions of time to file documents at the administrative level as outlined copiously in the section captioned "Background" in this opinion. Given Plaintiffs' failure to specify the location or nature of the alleged errors in question during the administrative proceedings and their untimeliness in submitting clarification after the publication of the final results, this Court finds that the offering was properly rejected as untimely.

This Court cannot permit Plaintiffs to stymie the work that Commerce has been mandated to perform by Congress on account of what appears to be the slovenly submission of data. Commerce has statutory deadlines that must be met. Plainly, it would be an impossible mission, and there would be, in any event, inadequate resources to enjoin Commerce to ensure that Plaintiff submitted data in a form satisfactory to Commerce. The agency is

not well-suited for that job. Plaintiffs must prepare their own data accurately. They cannot expect Commerce to be a surrogate to guarantee all of their submissions are correct.

Nevertheless, Plaintiffs cite this Court's decisions in *Serampore, Koyo,* and *Tehnoimportexport,* in support of a remand.

In *Serampore,* the Court, while affirming a portion of the remand results, granted a second remand for Commerce to determine whether an alleged clerical computer input error had been made, notwithstanding that the error was apparently not within the scope of the first remand and not raised in the previously underlying decision. 12 CIT at 834, 696 F.Supp. at 673. The Court noted that it was "loathe to affirm a determination that might be based on a questionable record." *Id.* If Commerce agreed there was such an error, it was directed to make appropriate corrections. *Id.*

In *Koyo,* the Court held that Commerce unlawfully refused plaintiffs' request for correction of certain clerical and transcription errors present in the computer data it submitted to Commerce to be employed by Commerce in preparing its final determination. 14 CIT at ——, 746 F.Supp. at 1111. The Court noted that the limited burden that would be imposed upon the ITA, by virtue of a remand ordering the correction of input errors, was far outweighed by the preference for accuracy in final dumping determinations. *Id.*

In *Tehnoimportexport,* the Court, in reviewing a final antidumping determination, found that where a plaintiff's mistake was so obvious, ITA's failure to correct it was an abuse of discretion. The Court directed Commerce on remand to make any adjustments that the corrections might require, noting that the additional calculations would not overburden the ITA, because there was, in any event, to be a remand for recalculation of packing costs. 15 CIT ——, 766 F.Supp. at 1179.

The cases cited by Plaintiff allowing corrections of data can easily be distinguished from the instant case. The errors in the instant case do not appear to be inadvertent clerical or transcription errors. The alleged errors reported on the tape might be Plaintiffs' failure to correctly calculate their home market credit expense or a failure to correctly report to Commerce the formula actually used on its computer tape and printout. One possibility is that Plaintiffs may have, in fact, used several different formulas to arrive at their credit expense results. It is also possible that Plaintiffs used one formula for the narrative response and another for calculation of the credit figures which appeared on the tape. Another possibility is that, in the continuum of revising tapes, Plaintiffs incorporated obsolete data. The errors may have been substantial and substantive from Plaintiffs' point of view. They were certainly not inadvertent clerical or transcription mistakes. They were not obvious. If they were, presumably Plaintiffs would have noticed them during the three-and-one-half month time period, between April 9, 1990 and July 27, 1990, referred to above.

If this Court were to approve of Plaintiffs' method of submissions, it might actually encourage others to manipulate figures and other data to get what it considered desired results from Commerce.

One might parry that because Commerce is to make other adjustments on another portion of a remand on this case, why not let them take care of these corrections in the interests of overall accuracy. If the Court were to adopt such a general policy, Commerce would be unnecessarily overburdened and litigants might tend to become slovenly with submitted data. Furthermore, it is not inconceivable that others might find convenient ways to unfairly manipulate data to skew the outcome of results. All proceedings must conclude. In *Koyo,* the Court noted:

There can be no doubt that Congress intended final determinations to be precisely that. Indeed, if determinations were constantly subject to amendment, "it would be difficult to answer the question as to when a *final* determination would ever be made." *Badger-Powhatan, Div. of Figgie Int'l, Inc. v. United*

*States,* 10 CIT 241, 245, 633 F.Supp. 1364, 1369 (1986) (emphasis in original). The Court further acknowledges that the imposed deadlines must be strictly adhered to if Commerce is to conduct antidumping investigations effectively. 14 CIT at ——, 746 F.Supp. at 1110.

This Court holds that Plaintiffs had ample time to make correct submissions and ample time to make any additions or corrections that were necessary. Because Plaintiffs did not make timely application to make the corrections, this Court holds Commerce did not abuse its discretion in refusing Plaintiffs the opportunity to make the corrections.

*Computer Programming Error Issue*

■ It is urged by Plaintiffs that the final results by the ITA were skewed by a not easily detectible computer programming error that resulted in the computer frequently choosing a foreign market value based on sales at a different level of trade for comparisons with purchase price. Plaintiffs maintain that the asserted computer programming error was brought to the attention of Commerce by a letter from Plaintiff SY nine days after the publication of the final results and requires correction because it is a substantial and major error.

The procedures Commerce must follow during an administrative review in determining antidumping duties are set forth at 19 U.S.C. § 1675(a)(2) (1988), which provides in pertinent part as follows:

**(2) Determination of antidumping duties**

[T]he administering authority shall determine—

(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

The administering authority ... shall publish notice of the results of the determination of antidumping duties in the Federal Register, and that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.

Provision for merchandise comparison in the two markets is found at 19 U.S.C. § 1677(16) (1988), which provides in pertinent part:

**(16) Such or similar merchandise**

The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

*See* 19 C.F.R. § 353.58 (1990).

Plaintiffs urge that Commerce, consistent with the statute, was obliged to compare home market sales and United States sales at the same level of trade. According to Plaintiffs, if there was a sale to the United States during July 1988 and there were no sales to be compared to establish

foreign market value on home sales in July, then the computer should have selected June 1988 for comparison in applying the so-called "90–60 day rule." For example, if no June sales existed, then the computer, in an order of priority, should have selected a foreign market value based on (1) August 1988 sales, (2) May 1988 sales, (3) September 1988 sales, or (4) April 1988 sales.

Plaintiffs urge that this procedure was followed for exporter sales prices; however, while the same procedure was followed in some, it was not followed in all comparisons of home market sales with purchase price sales. According to Plaintiffs, in those instances where it was not done, the computer emphasized the same month over the level of trade.

Plaintiffs contend that the inconsistent treatment of export sales price transactions and purchase price transactions reflect an unintentional programming error by Commerce that resulted in the use by the ITA of home market sales comparisons with export sales transactions in the same month, regardless of the level of trade.

■ This Court notes that the comparison methodology used by Commerce must be sustained unless it is unreasonable. *Melamine Chems., Inc. v. United States*, 2 Fed.Cir. (T) 57, 60–61, 732 F.2d 924, 928 (1984); *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404, 636 F.Supp. 961, 965–66 (1986), *aff'd*, 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987).

This Court holds that the methodology enunciated cannot be sustained and a remand must issue. Commerce acknowledges that in its original Memorandum it erroneously stated that the computer was programmed to select comparable sales for calculating foreign market value based upon product control numbers designated by Plaintiffs. Defendant's Supplemental Memorandum at 3. (Def.Supp.Mem.) Commerce indicates as follows:

> After reviewing [Plaintiffs'] reply, we recognized that our explanation was erroneous.... [W]hile the administrative record reveals that there appear to have been differences in the selection of foreign market values for comparisons with exporter's sales price transactions and with purchase price sales, it does not reveal the reasons for these differences.... [After asserting that Plaintiffs have failed to exhaust their administrative remedies by not bringing the errors to the attention of Commerce until after publication of the final results, Commerce concludes] the proper course of action would be to remand the foreign market value selection issue to Commerce so that it could examine it, give the reasons for its actions, and, if warranted, make any necessary corrections in the computer programming instructions.

*Id.*

This Court, while rejecting out of hand the argument of Commerce pertaining to the exhaustion of administrative remedies as somewhat disingenuous in light of the circumstances of this case, nevertheless commends Counsel for the Defendant for bringing this error of Commerce to the attention of the Court.

### *Exchange Rate Lag Rule Issue*

■ Plaintiffs contend that shortly after the issuance of the preliminary results, at the first opportunity, Plaintiffs requested Commerce to apply a 90–day lag in exchange rates for sales made between October 28, 1987 and March 31, 1988. AR Doc.Conf. R2 F521A–23A. According to Plaintiffs, their request was made consistent with *Industrial Quimica Del Nalon, S.A. v. United States* to apply 19 C.F.R. § 353.60(b) to an administrative review. 13 CIT 1055, 1063, 729 F.Supp. 103, 110 (1989), *appeal denied* (on interlocutory issue only) 8 Fed.Cir. (T) ——, 904 F.2d 44 (1990), *aff'd on results of first remand*, Slip.Op. 91–43 at 10–11, 1991 WL 94273 (May 24, 1991).

Commerce maintains that even if this Court were to decide 19 C.F.R. § 353.60(b) is applicable to administrative reviews, the specific rule should not be invoked because Plaintiffs have failed to establish the existence of the elements necessary for invocation of the rule. Commerce requests, furthermore, that this Court not follow decisions of the Court that extend the applicability of the specific rule to administrative reviews.

The issue then is whether the 90–day exchange lag rule applies to administrative reviews. If this Court finds that the 90–day lag rule applies to administrative reviews, the Court must then decide whether the Plaintiffs followed the applicable measures mandated by 19 C.F.R. § 353.60(b). 19 C.F.R. § 353.60 provides in full:

(a) *Rule for conversion.* The Secretary will convert, under section 522 of the Act (31 U.S.C. 5151(c)),[1] a foreign currency into the equivalent amount of United States currency at the rates in effect on the dates described in § 353.46, § 353.49, or § 353.50, as appropriate.

(b) *Special rules for investigations.* For purposes of investigations, producers, resellers, and importers will be expected to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates. When the price of the merchandise is affected by temporary exchange rate. fluctuations, the Secretary will not take into account in fair value comparisons any difference between United States price and foreign market value resulting solely from such exchange rate fluctuation.

For many years, the ITA applied this special rule only in original less than fair value investigations. *Melamine,* 2 Fed.Cir. (T) at 57, 732 F.2d at 924; *General Housewares Corp. v. United States,* 16 CIT ——,

783 F.Supp. 1408 (1992); *Pistachio Group of the Ass'n of Food Indus., Inc. v. United States,* 11 CIT 668, 671 F.Supp. 31 (1987), *aff'd on remand,* 12 CIT 416, 685 F.Supp. 848 (1988); *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States,* 10 CIT 424, 640 F.Supp. 255 (1986). In *Melamine,* the Court upheld ITA's use of a 90–day lag rule for selecting exchange rates and stated:

Though the CIT noted that the United States had cited "no authority for using a 90–day lag rule", that authority stems from Commerce' duty to enforce fairly the antidumping laws by determining whether LTFV sales are or are *not* occurring. The purpose of the antidumping law, as its name implies, is to discourage the practice of selling in the United States at LTFV by the imposition of appropriately increased duties. That purpose would be ill-served by application of a mechanical formula to find LTFV sales, and thus a violation of the antidumping laws, where none existed. A finding of LTFV sales based on a margin resulting *solely* from a factor beyond the control of the exporter would be unreal, unreasonable, and unfair.

2 Fed.Cir. (T) at 67–68, 732 F.2d at 933 (emphasis in original); *see General Housewares,* 16 CIT at ——, 783 F.Supp. at 1412.[2]

The decision of the Federal Circuit in *Melamine* reports ITA's perception of the

---

1. 31 U.S.C. § 5151 (1988) provides in pertinent part:

(c) Except as provided in this section, conversion of currency of a foreign country into United States currency for assessment and collection of duties on merchandise imported into the United States shall be made at values published by the Secretary under subsection (b) of this section for the quarter in which the merchandise is exported.

(d) If the Secretary has not published a value for the quarter in which the merchandise is exported, or if the value published by the Secretary varies by at least 5 percent from a value measured by the buying rate at noon on the day the merchandise is exported, the conversion of the currency of the foreign country shall be made at a value—

(1) equal to the buying rate at noon on the day the merchandise is exported; or

(2) prescribed by regulation of the Secretary for the currency that is equal to the first

buying rate certified for that currency by the Federal Reserve Bank of New York under subsection (e) of this section in the quarter in which the merchandise is exported, but only if the buying rate at noon on the day the merchandise is exported varies less than 5 percent from the buying rate first certified.

(e) The Federal Reserve Bank of New York shall decide the buying rate and certify the rate to the Secretary. The Secretary shall publish the rate at times and to the extent the Secretary considers necessary.

2. The Court in *General Housewares* found that "the plaintiffs [did] not establish[ ] that the margins they contest[ed] ... were caused by factors beyond their control, and the court thus conclude[d] that the ITA's reliance on subsection (a) rather than (b) of 19 C.F.R. § 353.56 [now codified at § 353.60] was supported by substantial evidence on the record and in accordance with law." 16 CIT at ——, 783 F.Supp. at 1414.

purpose and application of § 353.60(b) as follows:

Antidumping investigations are meant to determine whether prices of merchandise sold in the United States are at less than "fair value." When exchange rates are fluctuating substantially, a given dollar price of a product in the United States could change technically from fair to "unfair" literally from day to day, even if the foreign price of the product, [sic] denominated in the foreign currency, also remained constant. This result is not called for by the language or purpose of the Act. It would be unrealistic to expect business to change prices instantaneously to take account of fluctuating exchange rates....

The regulation, then, allows a reasonable period in which the business may take sustained exchange rate fluctuations into account. The regulation further instructs that temporary fluctuations should not be the sole basis for determinations of less than fair value sales. Businesses are to be given time to assess whether one currency has truly appreciated against another before changing their pricing practices.

2 Fed.Cir. (T) at 65–66, 732 F.2d at 932 (quoting *Melamine in Crystal Form from the Netherlands; Antidumping: Amendment of Final Determination,* 45 Fed. Reg. 29,619, 29,620 (May 5, 1980)).

The first time that § 353.60(b) was held applicable to administrative reviews was in *Quimica.* The Court in *Quimica* held that 19 C.F.R. § 353.60(b) "applies with equal force to review determinations, as well as fair value investigations." 13 CIT at 1063, 729 F.Supp. at 110; *accord Brother Indus., Ltd. v. United States,* 15 CIT ——, 771 F.Supp. 374 (1991).[3] In *Quimica* the Court concluded that it was not in accordance with law for the ITA to restrict application of the special rules under § 353.60(b) only to original LTFV investigations. The Court found that the special rule of § 353.-60(b) applied to administrative reviews, but left to Commerce to decide when to treat an exchange rate fluctuation under § 353.-60(b) or under a circumstance of sale adjustment under 19 C.F.R. § 353.56 (1990). 19 U.S.C. § 1677b(a)(4) (1988).[4] The Court reasoned that "it makes little sense to apply a regulation [§ 353.60(b) ] only during the determination phase (when only an estimate is necessary), and not during the as-

**3.** In *Brother Indus., Ltd. v. United States,* 15 CIT ——, ——, 771 F.Supp. 374, 384–86 (1991), the plaintiffs contested the final result of an antidumping duty administrative review of portable electric typewriters from Japan. The plaintiffs claimed that ITA's 1985–86 determination "was distorted by 'unprecedented and rapid' changes in the exchange rate [i.e., the appreciation of the Japanese yen] which should have been accounted for under 19 C.F.R. § 353.56(b) [now codified at § 353.60(b) ]." *Id.* at 385 (footnote omitted). Although the plaintiffs did not exhaust their administrative remedies by raising this issue during the ITA proceedings, the Court, nevertheless, granted a remand, following the holding in *Quimica,* 13 CIT at 1055, 729 F.Supp. at 103.

**4.** Commerce has on occasion employed a circumstance of sale adjustment as the proper vehicle where there are currency fluctuations due to exchange rates. *See Final Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany,* 54 Fed.Reg. 18,992, 19,085–86 (May 3, 1989).

Another example can be found in *Budd Co., Wheel & Brake Div. v. United States,* 14 CIT ——, 746 F.Supp. 1093, 1098–99 (1990). This Court held that Commerce's final determination

to use a circumstance of sale adjustment to reduce foreign market value by devaluation of Brazilian cruzeiro between date of sale and date of shipment was reasonable and supported by substantial evidence on the record. This Court pointed out in *Budd* the Federal Circuit's emphasis that "fairness is the touchstone of Commerce's duty in enforcing the antidumping laws." *Id.* at ——, 746 F.Supp. at 1099. Furthermore in *Budd,* this Court agreed with Commerce "that to the extent the circumstance of sale adjustment conflicted with the currency conversion regulations, it was appropriate for Commerce to choose to effectuate the primary statutory purpose in favor of fair determinations based on contemporaneous comparisons." *Id.* at ——, 746 F.Supp. at 1100 (citations omitted). The Court further pointed out that Commerce conceded that it "has 'normally limited [circumstance of sale] adjustments to those instances in which the differences in selling practices between the United States and home markets are directly related to the sales under consideration.'" *Id.* at ——, 746 F.Supp. at 1101.

Nevertheless, in *Budd* Commerce argued that they "are not precluded from using [the circumstance of sale] provision to achieve a result that reflects economic reality and is consistent with the basic purpose of the Act." *Id.* In fact, Commerce supported its use of circumstance of

sessment phase (which calls for a similar but more accurate calculation)." *Quimica,* 13 CIT at 1065, 729 F.Supp. at 111.

The problem is that § 353.60(b) only applies to investigations. The term investigation in § 353.60(b) is defined in 19 C.F.R. § 353.2(1) (1990) as follows:

An "investigation" begins on the date of publication of notice of initiation of investigation and ends on the date of publication of the earliest of (1) notice of termination of investigation, (2) notice of rescission of investigation, (3) notice of a negative determination that has the effect of terminating the proceeding, or (4) an order.

This Court is reluctant to tamper with the 353.60(b) regulation, which on its face appears to clearly apply only to original fair value investigations and not to administrative reviews.

Moreover, as the ITA asserted in *Quimica,* "[t]he rationale for denying application of the special rule to administrative reviews ... is that under a fair value investigation, interested parties are 'on notice' that prices will be monitored for purposes of those reviews. A respondent possesses the means to regulate its prices and must bear the risk of avoiding dumping margins due to currency changes." *Quimica,* 13 CIT at 1062–63, 729 F.Supp. at 110. This Court finds this reasoning sound.

Therefore, it appears that this notice precludes the necessity to implement the special rule during the assessment phase (administrative review). The special rule requires that "those covered by an antidumping-duty order will factor their expectations as to future rates of exchange into their pricing." *Brother Indus.,* 15 CIT at ——, 771 F.Supp. at 385. If unable to do so, "[c]laimants have to demonstrate on the record that the exchange-rate behavior was beyond their ability to compensate." *Id.* (citations omitted). For the reasons set forth in this opinion, this Court declines to follow the holding in *Quimica* that 19

C.F.R. § 353.60(b) applies to administrative reviews. Therefore, this Court finds that the ITA acted in accordance with the law.

## CONCLUSION

This Court orders that this action be remanded to Commerce for the preparation of revised final results to show channel-specific dumping margins for those distributors that were investigated and that Commerce is directed to determine what deposits, if any, were collected on account of Plaintiffs' distribution channels that were not investigated. Both parties agree that any overpayment is to be refunded upon liquidation. Furthermore, it is ordered that the case be remanded to Commerce for reexamination of the selection of home market models for comparisons with purchase price sales and exporter's sales price transactions. Commerce is directed to make any selection corrections required and to explain its rationale for any such selection correction. Plaintiffs' 56.1 Motion for Judgment Upon the Agency Record is denied in all other respects.

sale adjustment in exchange rate situations in *Amended Final Determination of Sales at Less Than Fair Value and Amended Antidumping Duty Order; Tubeless Steel Disc Wheels from Brazil,* 53 Fed.Reg. 34,567 (Sept. 7, 1988), when it stated that "our regulations have long recognized that special circumstances may require us to compensate where a strict application of our currency rules leads to an incorrect result. Application of a circumstance of sale adjustment in these special situations achieves the correct and fair result." *Id.*