**NTN BEARING CORPORATION OF AMERICA, American NTN Bearing Manufacturing Corp. and NTN Corporation, Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**The Torrington Company; Federal–Mogul Corporation, Defendant–Intervenors.**

**Court No. 91–08–00577.**

United States Court of International Trade.

July 13, 1993.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger, Kazumune V. Kano and Diane A. MacDonald, Chicago, IL, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis; of counsel: Stephen J. Claeys, Atty.–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Geert De Prest, John M. Breen and Margaret E.O. Edozien, Washington, DC, for defendant-intervenor The Torrington Co.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, J. Eric Nissley, Larry Hampel and Joseph A. Perna, V, Washington, DC, for defendant-intervenor Federal–Mogul Corp.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp. and NTN Corporation ("NTN"), move pursuant to Rule 56.1 of the Rules of this Court for partial judgment on the agency record as to Counts I, II, IV, VII, X, XI, XIII and XVII of their complaint claiming that the Department of Commerce, International Trade Administration ("Commerce" or "ITA"), (1) failed to correct errors in its determination which lead to tainted proceedings and unfairly high and inaccurate antidumping margins; (2) incorrectly calculated the variable costs of manufacturing merchandise sold in the home market due to an error in its program; (3) incorrectly rejected NTN's actual costs of production in favor of other "best information available"; (4) incorrectly included a theoretical amount for idled machinery not used in production and an amount representing NTN's loss on the disposal of fixed assets; (5) erroneously calculated margins on several sales to one purchase price customer twice due to the use of

both an original and a revised tape; and (6) failed to publish an amended final determination.

The administrative determination under review is the ITA's final results in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Final Results of Antidumping Duty Administrative Reviews ("Final Results")*, 56 Fed. Reg. 31,754 (1991). Substantive issues raised by NTN in the underlying administrative proceeding were addressed by the ITA in the Issues Appendix to *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review ("Issues Appendix")*, 56 Fed.Reg. 31,692 (1991).

### Background

On June 11, 1990, the ITA initiated an administrative review of ball bearings, cylindrical roller bearings, spherical plain bearings and parts thereof from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom Initiation of Antidumping Administrative Reviews*, 55 Fed.Reg. 23,575 (1990). NTN participated in this review. *Id.*

On March 15, 1991, the ITA published its preliminary determination in the administrative review. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts thereof from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Antidumping Duty Administrative Reviews*, 56 Fed.Reg. 11,186 (1991).

On July 11, 1991, the ITA published its Final Results in this proceeding. *Final Results*, 56 Fed.Reg. at 31,754.

### Discussion

■■■ In reviewing a final determination of Commerce, this Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir. 1990).

#### 1. Clerical Errors (Counts I and II)

First, NTN claims that Commerce committed various clerical errors. In its questionnaire for this review, issued on June 1, 1990 (Section A) and July 17, 1990 (Sections B–E), Commerce requested that respondents classify bearings based on certain criteria, including precision rating, into families. In its response to section B, NTN identified many different families and supplied a list of U.S. sales. On March 15, 1991, Commerce published its preliminary results and on April 11, 1991 NTN submitted its case brief detailing its comments to the preliminary results. NTN contends that at this stage it had "discovered two instances in the U.S. sales database for ball bearings (ESP transactions) which required a further explanation or a correction of information already on the record." *Plaintiffs' Motion for Partial Judgment on the Agency Record ("Plaintiffs' Motion")* at 11.

Specifically, NTN claims that the family code for five part numbers sold to the same U.S. customer incorrectly showed them to meet high precision bearing tolerances, rather than the standard precision bearing tolerances. NTN claims that this alleged error caused an inaccurate price differential and larger dumping margins.

The second alleged clerical error identified by NTN on April 11, 1991, involved four transactions which were reported as sales for U.S. consumption in NTN's response. NTN

now asserts that these sales were made to a Canadian customer.

■ According to 19 U.S.C. § 1675(f) (1988 & Supp.1993), Commerce is afforded the discretion to correct clerical errors in final determinations "within a reasonable time after the determinations are issued." Commerce has promulgated a regulation which sets time limits on the submission of factual information in administrative reviews. The regulation states in pertinent part:

§ 353.31 Submission of factual information.

(a) *Time limits in general.* (1) Except as provided in paragraphs (a)(2) and (b) of this section, submissions of factual information for the Secretary's consideration shall be submitted not later than:

(i) For the Secretary's final determination, seven days before the scheduled date on which the verification is to commence;

(ii) For the Secretary's final results of an administrative review under § 353.-22(c) or (f), the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review; ...

. . . .

(2) Any interested party ... may submit factual information to rebut, clarify, or correct factual information submitted by an interested party ... at any time prior to the deadline provided in this section for submission of such factual information or, if later, 10 days after the date such factual information is served on the interested party....

(3) The Secretary will not consider in the final determination or the final results, or retain in the record of the proceeding, any factual information submitted after the applicable time limit....

19 C.F.R. § 353.31(a) (1991).

The preliminary results were published on March 15, 1991, while the 180–day period after initiation of review ended April 11, 1991. Therefore, according to the statute, any information provided after March 15, 1991 will be considered untimely and under

§ 353.31(a)(3), the Secretary need not accept it when making the final determination. In this case, the "new" information was submitted by NTN in its brief dated April 11, 1991 and is thus indisputably untimely.

Commerce "is not required to correct a respondent's errors when a respondent reported erroneous data but failed to timely correct it." *See NSK Ltd. v. United States* ("*NSK I*"), 17 CIT ——, ——, 825 F.Supp. 315, 318 (1993); *see also NSK Ltd. v. United States* ("*NSK II*"), 16 CIT ——, ——, 798 F.Supp. 721, 725 (1992), *aff'd,* 996 F.2d 1236 (Fed.Cir.1993); *Sugiyama Chain Co. v. United States,* 16 CIT ——, ——, 797 F.Supp. 989, 996 (1992). To do this would put an undue burden upon Commerce "and litigants might tend to become slovenly with submitted data." *Sugiyama,* 16 CIT at ——, 797 F.Supp. at 995.

It is "the respondent's obligation to supply Commerce with correct information." *See NSK I,* 17 CIT at ——, 825 F.Supp. at 319; *see also Chinsung Indus. Co. v. United States,* 13 CIT 103, 106, 705 F.Supp. 598, 601 (1989). If, however, a clerical error is "so egregious and so obvious that the failure to correct it was an abuse of discretion and undermined the interests of justice, the Court may remand the case to the ITA for adjustment of the calculations." *Tehnoimportexport v. United States,* 15 CIT 250, ——, 766 F.Supp. 1169, 1178 (1991). Furthermore, "an error in original information submitted by a respondent must be obvious from the administrative record in existence at the time the error is brought to the ITA's attention." *NSK II,* 16 CIT at ——, 798 F.Supp. at 725.

In *NSK II,* NSK similarly alleged a clerical error and in its pre-hearing brief NSK provided new information on the production process for the roller bearings at issue, as well as corrected cost of production information, in an attempt to convince Commerce to correct the alleged error. *Id.* at ——, 798 F.Supp. at 721.

In that case, the Court stated that the "submission of detailed factual information at the pre-hearing brief stage of an administrative review is clearly untimely under any

circumstances." *Id.* at ——, 798 F.Supp. at 725.

■ In the case at hand, the primary issue is whether the information in question is new information or was on the administrative record beforehand. NTN has placed much emphasis on the assertion that the "new" information is in fact corrections of clerical errors and statistical mistakes of original, timely submitted data, provided in response to ITA questionnaires.

To support its contention for its first alleged error, NTN attached to its case brief on April 11 as Exhibit C, an affidavit of Mr. Akira Kinoshita, Vice–President of Engineering for NTN Bearing Corporation of America ("NBCA"), as well as engineering drawings prepared by the customer of the bearings. Doc. (Conf.) 288 at Exhibit C. These additions to the record on April 11 are clearly new information and thus untimely submitted.

To support its second contention, NTN claims that Commerce had information indicating such already on the record stating that NTN had submitted its customer list to Commerce as Exhibit 15 to its section B response. *Memorandum of Torrington Company in Opposition to Plaintiffs' Motion for Partial Judgment on the Agency Record,* Appendix 19. Plaintiff claims that this customer list for the four transactions in question showed a customer code for a customer located outside the United States. Upon evaluation of this list, it is not obvious that the customer code was for a customer located outside the United States. In addition, NTN attached to its April 11 brief an affidavit of Mr. Naokazu Iyama, Vice–President of NBCA attesting that these sales were not made to United States customers. Doc. (Conf.) 288 at Exhibit D. The affidavit also included attached copies of the invoices and bills of lading for the four transactions involved. NTN now asks this Court to remand this case back to Commerce for correction of these alleged clerical errors.

After a review of the record, this Court concludes that the information in question was in fact new information, and furthermore, NTN has not shown the error to be *obvious,* nor *egregious.* Thus, Commerce

need not have incorporated the newly provided data into its calculations.

■ Plaintiffs alternatively claim that since a remand has already been conceded to on two counts by Commerce, then it serves justice to remand "all errors," despite fault, to achieve the most accurate margins. *See NTN's Reply to the Responses of Defendant and Defendant–Intervenors to NTN's Motion for Partial Judgment on the Agency Record* at 22. In support of this assertion NTN cites *Serampore Indus. Pvt. Ltd. v. U.S. Dep't of Commerce,* 12 CIT 825, 696 F.Supp. 665 (1988), where this court allowed a remand under similar circumstances. Last year, however, the court in *Sugiyama,* 16 CIT at ——, 797 F.Supp. at 989, distinguished that a remand on the grounds that the errors in that case appeared to be inadvertent clerical or transcription errors, not errors in submission caused by incorrect formula calculations or other non-obvious substantive errors. That court noted:

> One might parry that because Commerce is to make other adjustments on another portion of a remand on this case, why not let them take care of these corrections in the interests of overall accuracy. If the Court were to adopt such a general policy, Commerce would be unnecessarily overburdened and litigants might tend to become slovenly with submitted data. Furthermore, it is not inconceivable that others might find convenient ways to unfairly manipulate data to skew the outcome of results.

*Id.* at ——, 797 F.Supp. at 995.

The facts in this case indicate that the errors were likewise of a more substantive nature and that they were anything but obvious. As in *Sugiyama,* these errors also do not merit an overall remand just because a remand may be conceded on other points. Therefore, plaintiffs' motion to remand this case for correction of clerical errors alleged in Counts I and II of its complaint is denied.

### 2. *Variable Costs of Manufacturing* (Count IV)

NTN claims that Commerce erred in merging NTN's weighted average home mar-

ket family variable costs of manufacture. Upon reexamination of the administrative record, Commerce agrees that it should not have merged variable costs of manufacture for both bearing families and specific models. Therefore, this case is remanded to Commerce for recalculation of NTN's variable costs of manufacture by merging the variable costs of manufacture for only home market bearing families.

3. *Best Information Available* (Count VII)

NTN also claims that Commerce's use of "best information available" ("BIA") in place of using NTN's actual costs of production was unreasonable and not supported by substantial evidence.

In this case, the only submissions provided by NTN that were discarded in favor of BIA statistics were for ball bearings. Commerce claims that this was done because, upon verification, NTN revealed that a "new" standard had been used to calculate labor (man-hours) and overhead costs for ball bearings while the "old" standard was still being applied to cylindrical roller bearings, spherical roller bearings, and other types of bearings. *See Defendant's Memorandum in Partial Opposition to Plaintiffs' Motion for Partial Judgment Upon the Administrative Record ("Defendant's Memorandum")* at 6. Commerce claims that the application of two standards would have potentially distorted the final determination because a disproportionate amount of labor and overhead might have been attributed to the "non-ball" bearings. *Id.*

Commerce stated on the record that "[b]y revising the standards for one type of bearing, NTN–Japan created a distorted base for allocating the shared labor and overhead costs and, thereby, distorted its COP expenses for ball bearings." *Issues Appendix,* 56 Fed.Reg. at 31,733.

The figure Commerce arrived at to compensate for this inconsistency was the difference between the old and new costs as they pertained to ball bearings. This was done to maintain uniform cost calculations.

The remainder of the statistical information used by Commerce for cylindrical,

spherical and other roller bearings was the data submitted by NTN in its questionnaire responses. Commerce did not disregard all the information provided by NTN, nor did it question the accuracy of the remaining data. Instead, it questioned the possible distorting effect on overall accuracy the ball bearing data might have. In addition, Commerce claims that BIA was appropriate because NTN failed to notify Commerce before verification that NTN had made this specific change in man-hour standards.

According to 19 U.S.C. § 1677e(c) (1988 & Supp.1993),

> the [ITA] shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

Furthermore, "if the [ITA] is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action." 19 U.S.C. § 1677e(b).

■ The purpose of this statute is to induce respondents to provide Commerce with timely, complete and accurate information so that Commerce may determine antidumping duty margins as accurately as possible. *Rhone–Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.Cir.1990). It has been said that "one may view the best information rule ... as an investigative tool, which that agency may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest." *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed.Cir.1984).

The Court of Appeals for the Federal Circuit in *Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565 (Fed.Cir.1990), interpreted 19 U.S.C. § 1677e(b) as clearly requiring "*noncompliance with an information request* before resort to the best information rule is justified, whether due to refusal or mere inability." *Id.* at 1574 (emphasis in original). Commerce may not properly conclude that resort to the BIA rule is justified in circumstances where a questionnaire is

sent and completely answered, just because the ITA concludes that the answers do not definitively resolve the overall issue presented. *Id.* Therefore, in order to apply the BIA rule in this instance, Commerce has to show that NTN did not provide complete answers to the questions presented in Commerce's request.

■ Commerce insists that although NTN may have directly answered Commerce's questions and informed them that NTN changed its man-hour standards, NTN failed to give complete and accurate answers by not informing Commerce until verification that such a change had been made. *See Defendant's Memorandum* at 36. Commerce's regulations provide that the submission of factual information for consideration in a final determination shall be made not later than "seven days before the scheduled date on which the verification is to commence." 19 C.F.R. § 353.31(a)(1)(i) (1991). If the submission is thereby untimely then Commerce may resort to BIA. *See Elkton Sparkler Co. v. United States*, 17 CIT ——, Slip Op. 93–69, 1993 WL 179266 (May 7, 1993).

NTN, however, claims that Commerce was aware of this before verification because of a chart NTN submitted with its supplemental questionnaire responses on November 27, 1990—two months prior to the date of verification. Commerce claims this chart only indicates changes in standard *costs*, not changes in *man-hours*, which is a component of standard costs.

The chart, however, should have put Commerce on notice that perhaps man-hours were changed as they are a component of standard costs. Furthermore, Commerce never asked NTN to clarify the changes in standard costs in its questionnaire responses, nor did it return data on the "new" standard and point out any insufficiencies.

By its own admission, however, both in the Statement of Facts and its argument, Commerce never asked NTN to clarify any of the cost data it had already submitted for ball bearings in the Supplemental Questionnaire. Instead, it only asked in the Supplemental Questionnaire for NTN to quantify its revisions to standard costs for each class or kind

of bearing under review. *See Defendant's Memorandum* at 5.

Commerce may not resort to best information available as an easy method to dispose of a case. Commerce's resort to BIA in this instance was an abuse of discretion since NTN substantially cooperated with Commerce. Thus, this case is remanded to Commerce for recalculation of NTN's cost of production and constructed value without resorting to BIA.

### 4. *Idled Machinery Amount* (Counts X and XI)

■ Plaintiffs further claim that Commerce's inclusion of a theoretical amount for idled machinery not used in production and an amount representing NTN's loss on the disposal of fixed assets was unreasonable and in conflict with Commerce's use of actual costs as reflected in respondent's books and records. NTN claims that it did not include depreciation expenses on idle machinery and equipment not used for production, or losses on disposal of fixed assets in its reported cost of production and constructed value. In accordance with generally accepted accounting principles ("GAAP") in Japan, NTN does not record any expense in its books and records to account for the theoretical depreciation. Commerce claims that a respondent's cost of production must include the respondent's costs from the depreciation of idled machinery and from the disposal of fixed assets.

In calculating the cost of production, Commerce is to "use the firm's expenses as recorded in its financial statements as long as those statements are prepared in accordance with the home country's generally accepted accounting principles ("GAAP") and do not significantly distort the firm's financial position or actual costs." *Ipsco, Inc. v. United States*, 12 CIT 1128, 1130 n. 3, 701 F.Supp. 236, 238 n. 3 (1988); *Carbon Steel Products from Brazil*, 49 Fed.Reg. 28,298, 28,302 (1984).

When calculating cost of production, Commerce generally uses those costs that are required to be reported by the respondent's home country's GAAP. Commerce, however, will not use a country's GAAP if it does not accurately recognize a company's actual

costs, or if it distorts those costs. *Ipsco*, 12 CIT at 1130 n. 3, 701 F.Supp. at 238 n. 3.

According to NTN, Japanese GAAP do not require NTN to record the costs from the depreciation of idled assets and the disposal of fixed assets. *Plaintiffs' Motion* at 66. These costs, however, are costs involved in the ordinary course of business. The fact that the costs of depreciation from idled assets and the disposal of fixed assets are not recorded in NTN's books and records is irrelevant to whether these costs are actually incurred and should be included in NTN's cost of production. Furthermore, to not include them would distort the company's financial position. Therefore, this Court affirms Commerce's determination as to this issue as it was reasonable and in accordance with law.

5.  *Calculation of Margins on Several Sales to One Purchase Price Customer* (Count XIII)

NTN also claims that Commerce committed a ministerial error in that due to Commerce's use of an original and replacement tape, margins on 46 sales to one purchase price customer were calculated twice. Upon reexamination of the administrative record, Commerce agrees that it calculated the margins for these 46 sales twice and, therefore, agrees that this case should be remanded to Commerce for recalculation of NTN's dumping margins to correct this error.

6.  *Amended Final Determination* (Count XVII)

NTN finally claims that Commerce failed to publish an amended determination excluding incorrect data. The Court sees no need for the publishing of an amended final determination as this case is now remanded and the remand results will be published in the future.

### *Conclusion*

In accordance with the foregoing opinion, plaintiffs' motion is granted in part and this case is remanded to Commerce to (1) recalculate NTN's variable costs of manufacture by merging the variable costs of manufacture for only home market bearing families; (2)

recalculate NTN's cost of production and constructed value without resorting to BIA; and (3) recalculate NTN's dumping margins to account for the 46 sales at issue only once. Plaintiffs' motion is denied in all other respects. Remand results are due within sixty (60) days of the date this opinion is entered. Comments to the remand results are due within thirty (30) days thereafter and responses to the comments are due within fifteen (15) days of the date comments are entered.