MURATA MFG. CO., LTD. and Murata Erie North America, Inc., Plaintiffs,

v.

UNITED STATES, Defendant.

Court No. 92-03-00208.

United States Court of International Trade.

April 20, 1993.

Donohue and Donohue, Joseph F. Donohue, Jr., Kathleen C. Inguaggiato and Daniel W. Dowe, New York City, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Civ. Div., Commercial Litigation Branch, U.S. Dept. of Justice, Marc E. Montalbine, David W. Richardson and Michelle Behaylo, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, of counsel, for defendant.

## *OPINION*

CARMAN, Judge:

Pursuant to Rule 56.1 plaintiffs move for judgment upon the agency record. Plaintiffs challenge *Cellular Mobile Telephones and Subassemblies from Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 7,728 (1992), issued by the International Trade Administration, U.S. Department of Commerce (Commerce). This action is brought pursuant to section 516A(a)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2) (1988), and pursuant to 28 U.S.C. § 1581(c) (1988).

## *BACKGROUND*

The administrative review which is the subject of this action was initiated on February 19, 1991. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed.Reg. 6,621 (1991). This review covered the entries of Murata Manufacturing Co., Ltd., for the period December 1, 1989 through November 30, 1990. The imports covered by the review were cellular mobile telephones (CMTs), CMT transceivers, CMT control units, and certain subassemblies thereof. *Cellular Mobile Telephones and Subassemblies from Japan; Preliminary Results of Antidumping Duty Administrative Reviews,* 56 Fed.Reg. 61,400 (1991).

Murata filed a consolidated response to Commerce's questionnaire on June 7, 1991. In its Section B response, entitled "Sales In The Home Market," Murata stated that it had listed its home market sales on a computer tape and that this list did not include sales of samples to purchasers in the home market. Sample sales were listed separately on Exhibit A–5–6 of Murata's questionnaire response. Murata's questionnaire response listed six different paired filter models sold in the United States during the period of review along with suggestions for the most similar models sold in the home market. Murata listed model KMGC104 as the paired filter sold in the home market during the period of review which was most similar to model KMGC109A.

On December 3, 1991, Commerce published the preliminary results of its review and reported a margin for Murata of 19.41 percent. *Cellular Mobile Telephones and Subassemblies from Japan; Preliminary Results of Antidumping Duty Administrative Reviews,* 56 Fed.Reg. 61,400 (1991). On December 9, 1991, Murata requested a disclosure conference and hearing regarding the preliminary results.

Murata attempted to submit a case brief to Commerce on January 8, 1992. Commerce rejected this brief on January 31, 1992, indicating that the brief violated 19 C.F.R. § 353.31(a)(ii), because it "contain[ed] factual information regarding sample sales that was not submitted before the date of publication of notice of preliminary results." Pub.Doc. 26. On February 4, 1992, Murata requested Commerce to reconsider its decision and to accept the contested information for the limited purpose of corroborating the fact that a clerical error was made in the home market sales submission. Murata argued that the model KMGC104 sales it had included in its Questionnaire Response were really sample sales which should not have been matched with United States sales in the calculation of the dumping margin. Pub.Doc. 27.

On March 4, 1992, Commerce published its final results of the administrative review. *Cellular Mobile Telephones and Subassemblies from Japan; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 7,728 (1992). In the *Final Results,* Commerce disagreed with Murata's argument that, since model KMGC104 sales were not made in quantities comparable to model KMGC109A sales, model KMGC104 sales should not be used as a basis of comparison with the U.S. model KMGC109A. Commerce also ruled that there was no evidence on the record prior to issuance of the preliminary results supporting the allegation that the KMGC104 sales were sample sales. Commerce stated further that sales are not necessarily samples because they are made in low quantities and at high prices. *Id.* at 7,729–30.

## *CONTENTIONS OF THE PARTIES*

Plaintiffs argue that Commerce should not have used sales of model KMGC104 as the

home market comparison model for United States sales of model KMGC109A for two reasons: (1) model KMGC104 was not sold in comparable quantities to model KMGC109A and (2) model KMGC104 sales were not sold in the ordinary course of trade. Plaintiffs contend that the use of model KMGC104 violates the antidumping law, because 19 U.S.C. § 1677b precludes the use of sales outside the ordinary course of trade in determining foreign market value. Plaintiffs point to the existence of small quantity/high price sales as sufficient to suggest that these sales were outside the ordinary course of trade. Plaintiffs further argue that Commerce erroneously concluded that information submitted by Murata to corroborate the occurrence of a clerical error, must be rejected. Murata claims that this clerical error resulted in the failure of model KMGC104 sales being properly labelled as sample sales.

Commerce claims that it properly compared sales of model KMGC104 with sales of model KMGC109A since it used the home sales of the model that Murata listed in its Questionnaire Response as the most suitable match for U.S. sales of KMGC109A. Commerce contends that there is insufficient information on the record to support Murata's claim that the sales of KMGC104 were not made in the ordinary course of trade. Commerce argues that it acted within its discretion in rejecting the factual information that Murata attempted to submit on January 8, 1992, as the submission was outside the time limits provided in 19 C.F.R. § 353.31(a)(1)(ii).

### STANDARD OF REVIEW

■ The standard of review in this action is whether the final results are supported by substantial evidence on the record and are otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted). "In addition, ITA's interpretation of the statute it administers must be reasonable and must not conflict with Congressional in-

tent." *Floral Trade Council v. United States,* 15 CIT 497, ——, 775 F.Supp. 1492, 1495 (1991).

### DISCUSSION

This Court has stated that "fair and accurate determinations are fundamental to the proper administration of our dumping laws" and that "courts have uniformly authorized the correction of any clerical errors which would affect the accuracy of a determination." *NSK Ltd. and NSK Corp. v. United States,* 16 CIT ——, ——, 798 F.Supp. 721, 724 (1992), citing *Koyo Seiko Co. v. United States,* 14 CIT 680, 682, 746 F.Supp. 1108, 1110 (1990). This Court has also noted that "Congress intended final determinations to be precisely that. Indeed, if determinations were constantly subject to amendment, 'it would be difficult to answer the question as to when a *final* determination would ever be made.'" *Koyo Seiko,* 14 CIT at 682, 746 F.Supp. at 1110 (citation omitted) (emphasis in original). Furthermore, this Court has recognized that "[p]laintiffs must prepare their own data accurately. They cannot expect Commerce to be a surrogate to guarantee all of their submissions are correct." *Sugiyama Chain Co., Ltd. et al. v. United States,* 16 CIT ——, ——, 797 F.Supp. 989, 995 (1992).

In determining foreign market value, Commerce is required by 19 U.S.C. § 1677b (1988) to look at the price at which "such or similar merchandise" is sold in the principal markets of the country from which the merchandise is exported. The term "such or similar merchandise" is defined in 19 U.S.C. § 1677(16) (1988). This statute provides:

The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

Plaintiff does not dispute that KMGC104 is such or similar merchandise with respect to KMGC109A. Although neither model KMGC104 nor KMGC106 is identical to model KMGC109A, both are identical to each other in physical dimensions, and costs of manufacture (product cost), and virtually identical in electrical specifications. In fact, Murata listed model KMGC104 as the paired filter sold in the home market during the period of review which was most similar to model KMGC109A sold in the United States. Paired filter model KMGC106 was listed by Murata as its second choice home market model. Murata now claims that despite providing Commerce with a list of home market sales which "include[d] all sales of the merchandise under consideration *except sales of samples* to purchasers in the home market," (emphasis added) and despite pointing to KMGC104 as the most similar model, that in fact KMGC104 was a sample and should not be considered.

■■■ Plaintiff bears the burden of proving whether sales used in Commerce's calculations are outside the ordinary course of trade. *Nachi–Fujikoshi Corp. and Nachi Am., Inc. v. United States*, 16 CIT ——, ——, 798 F.Supp. 716, 718 (1992). The only information on the administrative record to which Murata points concerning its claim that the sales of KMGC104 were not in the ordinary course of trade is that sales of model KMGC104 were generally made in smaller quantities and at higher prices than sales of model KMGC106. However, this information alone is insufficient to establish that the sales of KMGC104 were not made in the ordinary course of trade. As stated by Commerce in the final results, "[t]here is no evidence on the record prior to the issuance of [the] preliminary results that supports [Murata's] allegations of certain home market sales being samples." Final Results, 57 Fed.Reg. at 7730.

Furthermore, the administrative determinations cited by Murata do not support the proposition that the presence of low quantities and high prices by themselves indicate that a sale is outside the ordinary course of trade. One determination cited by Murata excluded the sample sales of two companies, Koyo and NTN. *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan, Final Results of Antidumping Duty Administrative Review*, 57 Fed. Reg. 4,951 (1992). The exclusion of certain of Koyo's sales was based on an examination of "Koyo's sales practices with respect to sample sales at the verification for the 1987/1988 review and [the determination] that the prices of samples were negotiated separately from the standard price agreements." *Id.* at 4,958–59. Similarly the exclusion of NTN's sales was not based on the presence of small quantity/high price sales alone, but rather on a determination that the transactions in question were "comprised of trial sales for evaluation by customers, sales of sample merchandise, and sales of very small quantities on a spot basis in unusual circumstances." *Id.* at 4,959. Murata cites another determination in support of its argument: *Final Determination of Sales at Less Than Fair Value, Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan*, 52 Fed.Reg. 30,700 (1987). Once again the determination to exclude sales was not based solely on the presence of small quantity/high price sales, but on that fact in combination with other circumstances such as the fact that most of the sales were later cancelled before the merchandise was invoiced to the purchaser. *Id.* at 30,704.

The Department of Commerce explicitly addressed the small quantity/high price sales issue that Murata raised in *Certain Welded Carbon Steel Standard Pipes and Tubes from India, Final Results of Antidumping Duty Administrative Reviews,* 56 Fed.Reg. 64,753 (1991). The Department stated its position as follows: "The Department, in determining whether home-market sales are in the ordinary course of trade, does not rely on one factor taken in isolation but rather considers all the circumstances particular to the sales in question." *Id.* at 64,755. The Department more specifically addressed the issue by stating that "the number of sales or volume sold are not in and of themselves definitive factors in determining whether the sales in question are in the ordinary course of trade." *Id.*

▮▮ Murata further argues that sales of KMGC104 should not have been matched with U.S. sales of KMGC109A because they were not sold in comparable quantities as is required by 19 C.F.R. § 353.55(a) (1992). This section reads as follows:

> (a) *In general.* In comparing the United States price with foreign market value, *the Secretary normally will use sales of comparable quantities of merchandise.* The Secretary will make a reasonable allowance for any difference in quantities, to the extent that the Secretary is satisfied that the amount of any price differential is wholly or partly due to that difference in quantities. In making the allowance, the Secretary will consider, among other things, the practice of the industry in the relevant country with respect to affording quantity discounts to those which purchase in the ordinary course of trade.

(Emphasis added). "Comparable" is broadly defined as "capable of being compared." *Webster's Third New International Dictionary* 461 (1986). This section does not state that Commerce will *always* use sales of *numerically equivalent* quantities of merchandise when making comparisons. Rather it reads that Commerce "*normally* will use sales of *comparable quantities* of merchandise." (Emphasis added). The requirement of comparability in 19 C.F.R. § 353.55(a) is present to insure that a difference in quanti-

ty does not cause a price differential between the items sold in the home market and those sold in the United States, a problem which is not raised by Murata. Commerce appropriately selected KMGC104 as a match for sales of KMGC109A and did not violate 19 C.F.R. § 353.55(a).

▮▮ Plaintiff must bear its burden by proving that the sales used in Commerce's calculation are outside the ordinary course of trade and it must satisfy this burden by providing the information to Commerce in a timely fashion in accordance with 19 C.F.R. § 353.31(a)(1)(ii) (1992). The administrative record reflects (and plaintiffs concede) that Murata's unsolicited factual information was submitted outside the time limits provided in 19 C.F.R. § 353.31(a)(1)(ii). However, plaintiffs contend that the information, and the circumstances under which it was filed, was not the type intended to be precluded by the regulation. Murata argues that its submission was not an unsolicited questionnaire response, but was instead intended to corroborate Murata's explanation that it had made a clerical error in preparing the response. This distinction is without merit. Murata submitted additional information to support its position that the home market sales of KMGC104 should be classified as sample sales. Such additional information is of the type intended to be covered by 19 C.F.R. § 353.31(a)(1)(ii). Commerce thus acted within its discretion in rejecting the untimely information that Murata submitted.

This Court is not unmindful that to the plaintiffs the result in this case may seem harsh. Nevertheless, as pointed out in *Sugiyama Chain,* plaintiffs must submit accurate data. They cannot expect Commerce, with its limited resources, to serve as a surrogate to guarantee the correctness of submissions. *Sugiyama Chain Co., Ltd. et al. v. United States,* 16 CIT ——, ——, 797 F.Supp. 989, 995 (1992). Commerce cannot reasonably be expected to know the affairs of sophisticated importing plaintiffs better than plaintiffs know such affairs themselves. Lastly, it occurs to this Court, were the rule otherwise, some plaintiffs might endeavor to disrupt administrative proceedings by improperly

608

seeking to manipulate data to secure Machiavellian style ends.

## CONCLUSION

This Court holds that Commerce's (1) comparison of home market sales of KMGC104 with U.S. sales of KMGC109A, (2) inclusion of sales of KMGC104 in its calculation of foreign market value, and (3) rejection of Murata's untimely submission of factual information were reasonable, supported by substantial evidence on the record, and in accordance with law. Therefore, the final results are sustained and this action is dismissed.